UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

OCT 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR 06-101-02-GK |
| ) | |
| NESTOR DARIO CASTRO ) | *Filed Under Seal* |
| a/k/a "Alberto" ) | |
| ) | |

### GOVERNMENT'S MOTION TO DETAIN DEFENDANT PENDING TRIAL

**COMES NOW** the United States of America, by and through the undersigned attorney, and hereby moves to detain defendant Nestor Dario Castro, a/k/a "Alberto" (hereinafter "Castro"), pending trial. In support thereof, the government states the following:

### FACTS

Castro was originally charged with federal narcotics offenses by complaint, filed on March 29, 2006. Pursuant to that complaint, a warrant for his arrest was issued on March 29, 2006 by order of the Honorable John M. Facciola, Magistrate Judge of the United States District Court for the District of Columbia. On April 4, 2006, Castro was arrested in Panama based on a provisional arrest warrant for extradition.

On April 25, 2006, a federal grand jury sitting in the District of Columbia returned and filed a one-count indictment charging Castro and four others with conspiracy to distribute five (5) kilograms or more of cocaine, intending or knowing that it would be unlawfully imported into the United States from the Republics of Colombia, Panama, Nicaragua, and elsewhere outside of the United States, in violation of Title 21, United States Code, Section 963; in conjunction with

Title 21, United States Code, Sections 959(a)(1) and 960, and Title 18, United States Code, Section 2. On April 25, 2006, a new warrant based on the indictment was issued by the Honorable Deborah A. Robinson, Magistrate Judge for the United States District Court for the District of Columbia. On October 5, 2007, Castro was extradited from Panama to the United States.

From October 2004 to April 4, 2006, Castro and the other charged defendants conspired to distribute hundreds of kilograms of cocaine, intending and knowing that the cocaine would be unlawfully imported into the United States. To accomplish their scheme, the defendants conspired to deliver quantities of cocaine to a Confidential Source (CS) in exchange for either weapons or cash.

The scheme was initially developed between the CS, based in Las Vegas, Nevada, and Castro's codefendant Harol Rodrigo Suarez Garcia (hereinafter "Suarez"). During 2004-2005, the CS and Suarez communicated by phone over 70 times, and by email at least 20 times. Over 50 of these calls and emails dealing with the purchase of heroin and cocaine were intercepted. During these communications, Suarez advised that he and his associates, Colombian paramilitaries, were interested in exchanging heroin and cocaine for weapons, such as AK-47 rifles and C-4 explosives. As the investigation developed, it became clear that Castro was Suarez' boss.

On June 21, 2005, the CS and Saurez met in Tegucigalpa, Honduras regarding the exchange of narcotics for weapons. The meeting was video and audio recorded.

On November 4, 2005, the CS met with Suarez and co-defendant Estuardo Gonzalez, in Managua, Nicaragua. The CS then took Suarez to view the weapons that Suarez and Gonzalez

2

were interested in buying in exchange for narcotics. The weapons were provided by the Nicaraguan National Police (NNP) at a secret location. A Nicaraguan National Police (NNP) undercover officer (UC) accompanied the CS in conducting the weapons flash to Suarez. Suarez was shown a multitude of AK-47's, C-4's, M-79's M-60's, RPG's and ammunition. Suarez was allowed to photograph and video the weapons and did so with a digital camera. The weapons flash itself was surreptitiously video and audio recorded by DEA.

The next day, on November 5, 2005, the CS again met with Suarez and Gonzalez, this time in a video/audio-taped hotel room, to fine tune the details of the weapons deal. They agreed upon the following prices for the narcotics-weapons swap:

| | |
|---|---|
| 600 AK-47's | (150 kilos of cocaine or 75 kilos of heroin) |
| 10 M-60's | (10 kilos of cocaine or 5 kilos of heroin) |
| 15 M-79 | ( 30 kilos of cocaine or 15 kilos of heroin) |
| 50 kgs C-4 | ( 200 kilos of cocaine or 100 kilos of heroin) |
| 250 cases Ammunition AK-47 | (400 kilos of cocaine) |
| 6 RPG-7's | (12 kilos of cocaine or 6 kilos of heroin) |
| 40 RPG Rounds | (400 kilos cocaine or 200 kilos heroin) |

They also agreed that a $330,000 deposit would be paid to the CS on November 7, 2005, with the balance being payed on November 9, 2005. Although Suarez and Gonzalez seemed pressured to get the weapons back to Colombia, they never came up with the funds for the deposit. However, Suarez continued to stay in close contact with the CS in an effort to execute the narcotics for weapons deal.

On February 27, 2006, the defendant Castro entered the picture, when the DEA Cartagena Resident Office (CRO) and Colombian National Police (CNP) conducted surveillance of a meeting between the CS, Suarez, Castro and a fourth codefendant, Ceasar Ramirez. The meeting was audio-recorded. The purpose of the meeting was to introduce the CS to Castro and

Ramirez, who were presented as members of the right-wing paramilitary organization "United Self Defense Forces of Colombia", better known as the AUC, and to finalize the details of the weapons for narcotics transaction. Castro, who was introduced as the boss, stated that they were ready to do the deal, either in Colombia or Panama. Castro said he had a cocaine lab about 22 hours drive into the mountains from Bogotá that could produce about 350 kilos every 48 hours. The CS and his associates would have to stay in Colombia for 15-20 days until the cocaine order was ready, at which time Castro would call his contact in the Colombian Navy to ensure the load could be taken out of the Colombian coast safely. Under that plan, the CS would bring the weapons by boat and the drugs would be exchanged for the weapons via boat on the high seas. Alternatively, Castro suggested the drugs could be handed over in Panama, where they had 2000 kilos ready.

However, the CS said he was still not ready to receive cocaine. He said he needed to do the deal in either Panama or Nicaragua in about two weeks. Ramirez asked the CS if he was interested in buying 25% more cocaine with cash, on top of that traded for the weapons. The CS agreed to buying the addition cocaine with cash, and said the transaction would be conducted in Panama in two to three weeks. Castro, Suarez and Ramirez agreed.

On March 20, 2006, the CS placed a consensually recorded telephone call and spoke with Castro. During the conversation, Castro and the CS discussed the costs of transporting cocaine from Colombia to Las Vegas, Nevada. Castro advised the CS that he would be giving the CS 200 kilograms of cocaine privately in Panama for the CS to sell in the United States, in addition to the cocaine being provided by his organization for the drugs for weapons deal.

The CS and Castro agreed that on March 29, 2006 Castro would be sending an associate

to meet the CS in Managua, Nicaragua in to order to again verify the weapons that would be traded for cocaine in Panama. After that final weapons flash, the CS would then travel to Panama to meet on March 31, 2006 with Castro and other coconspirators, who the CS understood to be Suarez, Gonzalez, Ramirez and other unidentified associates, at which time he would be shown the cocaine to be traded for weapons. If the CS was satisfied with the drugs, Castro would give him the coordinates of a clandestine airstrip in Venezuela to deliver the weapons by plane. Upon delivery of the weapons in Venezuela, the drugs would be turned over in Panama.

On March 21, 2006, the CS received a call from Suarez advising that his boss, Castro, would be calling the CS in a few minutes, and for the CS to be ready for the call. The CS recorded the call from Castro, who said he was making preparations for the upcoming meeting in Panama on March 31. Castro again stated he would be giving the CS an additional 200 kilograms of cocaine on credit for the CS to sell in the United States. The CS explained that the price of one kilogram of cocaine in Las Vegas is $16,800, while the price rises to $21,000 in the other areas of the United States that the CS transports drugs to. Castro said he understood.

Castro again stated his associate would verify the weapons in Managua on March 29, 2006. The CS advised Castro that he/she would have everything in place to conduct the transaction on March 31 in Panama, and Castro agreed. Castro said he would give the CS the location to send the weapons the following week.

On March 28, 2006, the CS received a telephone call in the United States from a man who identified himself only as "Santiago". Santiago, later identified as codefendant Carlos Ernesto Barreto-Sierra (hereinafter "Barreto"), advised the CS that he was calling on behalf of

Suarez and was waiting in Managua, Nicaragua to meet with the CS to view the arms that the CS was to provide. The CS responded that he/she would arrive in Managua later that same day. Upon arriving in Managua later on March 28, 2006, the CS made a consensually recorded telephone call to Barreto and advised Barreto that they would meet the following morning to view the arms.

On March 29, 2006, the CS made a consensually recorded telephone call to Barreto in which the two arranged to meet to review the weapons in Managua. The CS met with Barreto while several DEA Agents performed surveillance. The CS and a Nicaraguan law enforcement officer acting in an undercover capacity transported Barreto to an undercover location where they showed him a large cache of military-grade arms to include assault rifles, grenade launchers, and high powered rounds. Barreto inspected the weapons thoroughly and called Castro on the telephone to inform Castro that the weapons were acceptable and to continue with plans to deliver the CS approximately 900 kilograms of cocaine in Panama on March 31, 2006. The weapons flash was video-recorded. Barreto then informed the CS that he would be traveling to Panama on March 30, 2006 to be present for the cocaine delivery.

On March 31, 2006, the CS, in Panama, made a consensually recorded phone call to Suarez to discuss the upcoming deal. On March 31, 2006 and April 1, 2006, the CS and an undercover Panamanian law enforcement officer met with Castro, Suarez, and Barreto to discuss the transaction. When the parties were unable to reach final agreement as to the exact details of the transfer, the CS advised that Castro, Suarez, and Barreto could continue negotiating with the Panamanian undercover officer.

On April 4, 2006, Suarez and Castro contacted the Panamanian undercover officer and

advised him that they would require a $1 million payment prior to delivering the cocaine, which was contrary to what was previously agreed. The CS called Suarez and Castro, who informed him/her that, due to the fact the CS was no longer in Panama, they would only feel comfortable transferring the drugs to the Panamanian undercover officer if the latter was able to provide the requested currency up front.

At that point a decision was made to arrest the defendants. On April 5, 2006, Castro, Suarez and Barreto were taken into custody by Panamanian government officials pursuant to a provisional arrest warrant for extradition. On May 15, 2006, Castro's booking photograph from his arrest in Panama was shown by DEA to the CS, who identified it as being the photograph of "Dario", the same Dario Castro with whom he/she negotiated the cocaine for weapons swap, as discussed in this motion.

## ARGUMENT

### Statutory Presumption

The presumption of detention under 18 U.S.C. §3142(e) applies in this case. Under 18 U.S.C. §3142(e), there is a statutory rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community if the judicial officer finds that there is probable cause to believe that the defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act. An indictment charging a qualifying offense, as is the case here, is sufficient to trigger this presumption. United States v. Smith, 79 F.3d 1208 (D. C. Cir. 1996); United States v. Mosuro, 648 F. Supp. 316, 318 (D.D.C. 1986). When the presumption is triggered, it operates "at a minimum to impose a burden of production on the

defendant to offer some credible evidence contrary to the statutory presumption." United States v. Alatishe, 768 F.2d 364, 371 (D. C. Cir. 1985).

### Nature and Circumstances of Offense Charged

The offense charged involves an international drug conspiracy to distribute huge quantities of cocaine, with the ultimate goal of importation into the United States. Castro is a leader among the coconspirators and is aligned with the armed paramilitary organization AUC, a U.S. State Department-declared foreign terrorist organization.

### Weight of the Evidence

On April 25, 2006, after hearing a summary of the evidence in the case, a federal grand jury found probable cause to believe that Nestor Dario Castro, a/k/a "Alberto", had committed the charged offense.

### History and Characteristics of the Defendant

Castro is a Colombian citizen with no known ties to the United States, much less to this community, which is another factor relevant to the need for his detention pending trial. 18 U.S.C. § 3142(g)(3)(A). See United States v. Townsend, 897 F.2d 989 (9th Cir. 1990). Several courts have ordered pretrial detention of foreign defendants without any contacts to the United States. E.g., United States v. Vargas, 804 F.2d 157 (1st Cir. 1986) (Chilean defendant in drug importation case who had no family ties to U.S. was properly detained when no conditions or combination of conditions would reasonably assure his appearance at trial); United States v. Geerts, 629 F.Supp. 830 (E.D. Pa. 1985) (defendant was citizen of Netherlands who faced possibility of approximately fifty years imprisonment on customs related charges and had no significant ties to United States; he thus presented serious risk of flight which justified pretrial

detention).

### Safety of the Community

The federal courts have recognized that drug traffickers, particularly those in positions of authority, are likely to continue engaging in drug related activities if released on bail and thus constitute a danger to the community. See United States v. Knight, 636 F.Supp. 1462 (S.D. Fla. 1986). Accord United States v. Creekmore, 1997 W.L. 732435 (D.D.C. 1997)(Facciola, J.).

Although the defendant's involvement in an international drug trafficking conspiracy is alone sufficient to warrant detention without bond, the potential danger to the community is aggravated in this case by the fact that the defendant is aligned with the AUC, a State Department-designated terrorist organization operating in Colombia, and the fact that military-grade weapons were allegedly to be exchanged for narcotics.

### Risk of Flight

A determination of risk of flight must be supported by a preponderance of the evidence. United States v. Xulam, 84 F.3d 441, 442 (D. C. Cir. 1996). The Government submits that Castro is a significant flight risk, and due to the seriousness of the crime charged, he would attempt to leave the U.S. if given the opportunity. On November 25, 2006, his co-defendant, Carlos Ernesto Barreto-Sierra, escaped from Panamanian custody to avoid being extradited to the United States.

Castro has no independent immigration status in the U.S. apart from being paroled into the U.S. to face the current charges, pursuant to his extradition from Panama. Moreover, there are compelling reasons to believe that the defendant would have the ability to flee this country if he were released on bond because of his numerous contacts in Central and South America. In the

event that he were to abscond, it would be almost impossible to ever locate him again.

**WHEREFORE**, for the foregoing reasons, the Government submits that the defendant be detained without bond pending trial.

 

Respectfully submitted,

_____
James A. Faulkner
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
(202) 616-8648

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing Motion To Detain Defendant Pending Trial and Proposed Order of Detention was scanned and emailed to defense counsel on October 11, 2007.

                                                                _____
                                                                James A. Faulkner