UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>　　　Plaintiff,　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>　　　v.　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>**HAROL RODRIGO SUAREZ-GARCIA** )<br>　　a/k/a "Jose Luis Herrera," a/k/a )<br>　　"Chico," a/k/a "Dominick,"　　　)<br>　　　　　　　　　　　　　　　　　)<br>**NESTOR DARIO CASTRO,**　　　　　)<br>　　a/k/a "Alberto,"　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>　　　Defendants.　　　　　　　　　) | **Crim. No. 06-101 (GK)** |

**GOVERNMENT'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANTS'
REQUEST FOR NOTICE OF INTENTION TO USE RULE 404(b) EVIDENCE AT
TRIAL**

　　　The United States of America, by and through the undersigned attorney, hereby gives notice to the defendants of its intention to admit evidence of uncharged conduct which is direct evidence of, and intrinsic to, the charged conspiracy, as well as evidence of the prior relationship between Suarez and the CS.

1. **Factual Background**

　　　On March 17, 2008, defendant Harol Rodrigo Suarez-Garcia filed a Request for Notice of Intention to Use 404(b) Evidence at Trial (ECF Document 40).  On April 5, 2008, the government responded to that request by giving notice to the defendants of its intention to admit evidence of uncharged conduct which is direct evidence of, and intrinsic to, the charged

conspiracy (ECF Document 44). On May 23, 2008, the defendants filed a second Request for Notice of Intention to Use 404(b) Evidence at Trial (ECF Document 60). On June 1, 2008, the government responded with a supplemental response (ECF Document 67). The present response is to the Court's order of June 9, 2008 requesting notice to the defendants of "any evidence of other crimes, wrongs, or 'bad acts' that the government intends to introduce at trial." Ct. Order at 1-2.

The defendants are charged in the present indictment with conspiracy to distribute cocaine intending and knowing that such cocaine would be imported into the United States. The charged conspiracy covers the period beginning on or about October 2004 and continuing up to and including April 5, 2006. The object of the conspiracy was to sell heroin and cocaine in exchange for military grade weapons, with the intent that the narcotics be imported into the United States and the weapons be provided to the "United Self Defense Forces of Colombia" (AUC), a right wing paramilitary organization in Colombia. The government does not plan to introduce evidence of other crimes outside of this conspiracy, but rather only those acts pertaining to an evolving agreement to sell heroin and cocaine in exchange for cash and weapons, as well each defendant's association with the AUC and other co-conspirators. In an abundance of caution and to avoid unnecessary sidebars at trial, the government is putting the defendants on notice that the following four pieces of evidence will but used at trial: (1) Statements by Castro pertaining to an agreement between Castro and the Confidential Source (CS) for the purchase of an additional 200 kilograms of cocaine on credit; (2) Statement by Gonzalez concerning his previous arrest in Nicaragua; (3) Statements by Suarez pertaining to his attempts to hire the CS to launder money; and (4) Evidence of the prior relationship between Suarez and the CS. The defendants have been aware of the first three pieces of evidence for

quite some time; the reports containing this information were made available to Defendant Castro's counsel on October 30, 2007 and to Sussman on January 17, 2008. The fourth piece of evidence recently came to light.

### A. Evidence of Separate Agreement to Purchase Cocaine on Credit

In addition to the agreement between the defendants and the CS to exchange approximately 700 kilograms of cocaine for weapons, Castro made several statements pertaining to an additional agreement for the CS to buy 200 kilograms of cocaine on credit. These statements have been reflected repeatedly in discovery, and were specifically mentioned in "Government's Motion to Detain Defendants." On February 27, 2006, at a meeting to finalize the details of the weapons for narcotics transaction, Ramirez asked the CS if he would be interested in paying cash for 25 percent more cocaine, in addition to the cocaine being traded for weapons. The CS agreed to this separate deal. On March 21, 2006, the CS received a call from Castro which the CS recorded. Castro stated that the CS could obtain an additional 200 kilograms of cocaine on credit for the CS to sell in the United States. The CS explained that the price of one kilogram of cocaine in Las Vegas was $16,800, while the price rose to $21,000 in other areas of the United States to which the CS would transport the drugs.

### B. Evidence of Attempt by Suarez to Launder Money

As indicated by DEA reports on December 27, 2004 and November 4, 2005, Suarez repeatedly tried to arrange for the CS to launder money for Suarez's organization, which laundered money through a clothing company in Colombia owned by an unknown Japanese national. As early as December 2004, Suarez was attempting to get the CS to pick up money in New York, Chicago, Miami and Madrid, Spain and wire it to the clothing company in Colombia.

The amount of money Suarez intended to pay the CS for these services ranged from $360,000 to $2,000,000.

On November 2004, while the CS and UC were transporting Suarez and Gonzalez to their hotel in Managua, Nicaragua, Suarez again brought up the possibility of the CS laundering money for their organization. The CS told Suarez that he/she had the ability to move up to one million dollars in U.S. currency from the United States to Central America. The CS stated that he/she could move this quantity in about five days and would charge 3% for his/her services. Suarez said the Cali organization, for which he worked, was interested in new avenues for laundering money and he thought that was a good rate and a reasonable turnaround time.

### C. Evidence of Gonzalez's Previous Arrest in Nicaragua

On November 3, 2005 the CS traveled to Managua, Nicaragua to further negotiations on the cocaine for weapons deal and to verify the presence of the weapons for Suarez and Gonzalez. On November 4, 2005, Suarez and Gonzalez met the CS, along with a Nicaraguan National Police (NNP) undercover officer (UC), at the bus station. While en route to the hotel in Managua, Gonzalez appeared nervous and stated to the CS that he had previously been arrested with 170 kilograms of cocaine in Nicaragua. The NNP confirmed that Gonzalez had been arrested in August, 2004 with approximately 163 kilograms of cocaine. Gonzalez was charged with international drug trafficking but had been released under suspicious circumstances. Gonzalez told the CS that because of his previous arrest, he would not be going to see the weapons and that Suarez would be going alone. Later on the day of November 4, the CS, UC and Suarez travelled without Gonzalez to an undercover location for Suarez to view the weapons cache.

### D. Evidence of Prior Relationship Between Suarez and the CS

4

In the course of pretrial discussions with the CS the government has recently become aware of the following evidence which was not included in discovery but which the government seeks to admit at trial to explain logically how the conspiracy developed and to prove motive, opportunity, intent, plan, knowledge, identity and/or absence of mistake under Rule 404(b) of the Federal Rules of Evidence.

The CS will testify that he has known Harol Rodrigo Suarez-Garcia since the late 1990's due to the fact that the two of them worked for the Remon-Way / Cruz-Garcia drug and weapons trafficking organization. As can be seen, for example, in the chat messenger email between the CS and Saurez on February 15, 2006,[1] this prior relationship was critical in facilitating the trust that allowed the charged conspiracy to develop. Early in the conspiracy it became apparent that Suarez was concerned about losing drugs while working with the CS. To reassure him, the CS told Suarez to tell the suppliers and other co-conspirators about the people with whom Suarez and the CS used to work in the 1990's, so that the suppliers would be reassured. In subsequent emails and recordings,[2] Suarez tells the CS that he has told the suppliers to check his and the CS' common references, and as soon as they get back to him the deal can be done. Thus, as indicated on the recordings provided in evidence, the prior relationship, as fleshed out below, allowed Suarez to advocate for the CS with his suppliers. This ability to vouch for the CS, as well as the ability to refer suppliers to people that both the CS and Suarez had worked with, allowed for Suarez to build trust between everyone in the conspiracy, from his suppliers to the CS. Trust is an extremely important commodity in such a high-risk and high-profit business like cocaine

---

[1] This email was provided to defense counsel on October 30, 2007 and January 17, 2008. In the email Suarez states, "Well, I told them that [you] were recommended by the gentlemen who are friends of mine from Guate, with whom I used to work, so they could open some doors for me," in reference to members of the Remon-Way / Cruz-Garcia organization with whom both Suarez and the CS used to work.

[2] For example, see discussion of references in November 15, 2004 email between Suarez and CS.

5

trafficking. Therefore, the trust that developed was vitally important to the creation of the conspiracy and is critically relevant to the story that will be told at trial.

In the late 1990's the Remon-Way / Cruz-Garcia organization transported cocaine by land through Central America to the U.S., and heroin by abdominal drug couriers on airlines from Central America to the U.S. Additionally, the organization transported U.S. drug dollars from the U.S. to Central America in stolen Caterpillar road construction equipment which the company used in a legitimate road construction company in Guatemala called "Remway", owned by two brothers – Francisco Remon-Way and the late Daniel Remon-Way.

From 1997 to February, 2001, the CS was a mechanic for the organization and held other positions. He also worked as a driver and assistant to a high-ranking associate of the Remon Way brothers by the name of Victor Manuel Cruz-Garcia, who managed much of the logistics for the organization in bringing cocaine from Colombia and Costa Rica to Guatemala and Mexico, and transporting heroin from Guatemala to the United States through human internal transporters, and the transportation of drug dollars and weapons in stolen Caterpillar road equipment from the U.S. and Mexico to Guatemala. After being stolen in the U.S., minor alterations were made to the road equipment so that it could be used to transport dollars into Mexico. Once in Mexico, the equipment (already loaded with dollars), was further modified to fit disassembled AK-47 assault weapons and bullet magazines.[3] The equipment was then transported to Guatemala and El Salvador with the dollars and weapons. Upon arrival in Guatemala and El Salvador, the dollars and weapons were unloaded, and the AK-47's were reassembled. One of the CS' jobs for the organization was to re-modify the machinery for service in the Remway construction company after the drugs and weapons had been taken out.

---

[3] The CS observed this process in Mexico on two occasions.

6

In approximately 1998, the CS attended four meetings over an approximately six month period of the Remon Way organization in which the defendant Suarez was present.[4] The first meeting occurred on a farm controlled by the Ramon Way organization in Santa Ana, El Salvador. The CS and Cruz-Garcia arrived at the farm where they awaited the arrival of two large trucks containing Caterpillar road construction equipment loaded with dollars and weapons. The defendant Suarez arrived at the same time as the trucks with an older male by the name of Erwin Perez-Mazariegos. After the CS took the equipment apart, approximately $240,000 and over 100 AK-47's were unloaded from the machines. During this process, the CS saw Suarez picking up and examining AK-47's that had been unloaded from the vehicles. After the vehicles were unloaded, the CS and Cruz-Garcia went to a nearby residence to sleep. When they returned to the machines the next day, Suarez and Perez-Mazariegos were still there along with two Colombians, cleaning and putting together the AK-47's.

Two or three days later the CS saw Suarez again in Villa Nueva, Guatemala in one of Remway's garages used to re-modify construction equipment. The CS was at the garage for about 3-4 hours taking out hydraulic systems out of old construction equipment to make space for weapons and money to be transported to Panama. The CS was able to fit 80 AK-47's in the modified space. While there, Suarez and Perez-Mazariegos stopped by and received an inch thick bundle of U.S. dollars and a passport from Remon Way. The organizations employees were forced to used a different false passport each time when traveling internationally. After receiving the money Suarez and Perez-Mazariegos were taken to the airport by Remon Way's cousin and driver Jorge Castillo. The CS and Cruz-Garcia followed them to the airport.

---

[4] The CS did see Suarez on one occasion prior to this period, as Suarez was entering the Remway building in Guatemala City, Zone 7. However, this was prior to the CS becoming privy to the company's drug trafficking activities.

7

A few months later the CS saw Suarez again for about 45 minutes at a meeting at the same farm in Santa Ana, el Salvador. The CS and Cruz-Garcia were in El Salvador to check up on the organizations' stash houses in El Salvador, and paying the stash house guards. The defendant Suarez arrived with Perez-Mazariegos and two kilos of heroin. In front of the CS, Suarez showed Cruz-Garcia and one of the stash house guards, so that the latter two could verify the quality of the narcotic. Cruz-Garcia was concerned about the color.

During the meeting, Suarez had a telephone conversation in which the destination of the heroin was discussed. Suarez mentioned that one "student" (human transporter) was going to Georgia and the other three others were destined for Chicago, but that the restaurant used by the organization in Chicago was "hot" and a safer location would have to be used. Suarez stated that he would keep the "students" (human transporters) in "my house" until the new destination could be determined. During the conversation, Suarez also discussed how using the road equipment loaded with money in the U.S. to pick up additional weapons in Mexico was a problem.

The fourth and final meeting occurred a few months later in Villa Canales, Guatemala in another one of Remon Way's garages. On that occasion a member of the organization by the name Carlos Castillo delivered AK-47's hidden in a fruit truck to the garage, so that the guns could be loaded onto old road construction equipment for disguised transport to Panama. The CS' was there with Cruz-Garcia and helped modify the equipment to make room for the rifles, and also unloaded $240,000 from the secret compartments of two cars that had been brought the garage. While there, the CS again saw Francisco give money to Suarez and Perez-Mazariegos.

In October 2000, while still working for the Remon-Way / Cruz-Garcia organization, the CS was formally established as a DEA Confidential Source, though he had been providing

8

information to DEA previously. The CS eventually moved to the U.S. and continued cooperating with the DEA.

In early September 2004, the CS was in contact with Suarez' colleague Perez-Mazariegos' son, Erwin Beanco Perez-Sagastume, who had recently moved from Guatemala to Los Angeles. Perez-Sagastume told the CS that his father Perez-Mazariegos and Suarez were still doing business together in Guatemala, and gave the CS his father's contact information in Guatemala. The CS left a message on Perez-Mazariegos' cell phone, and received a call back in which both Suarez and Perez-Mazariegos spoke to the CS by passing the cell phone back and forth.

During the call, the parties exchanged contact information and began talking about doing drug business together. Over the next several weeks the CS had several phone conversations with Suarez and a few with Perez-Mazariegos. During these calls, Suarez explained that his own drug trafficking activities had slowed down because Perez-Mazariegos had lost a load of heroin and a load of weapons. As a consequence, Suarez said that recently he had been bringing small loads of 1-3 kilos of heroin per trip from Panama to Guatemala, and occasionally up to Mexico, in order to pay the debt for the drugs and weapons that had been lost. Additionally, Suarez stated that, on behalf of an associate in Belize, he was involved in making heroin pellets and had a house that abdominal drug couriers used to consume heroin pellets prior to boarding their flights.

Finally, Suarez stated that he had access to large quantities of both heroin and cocaine in Colombia, but that he needed to find good, large scale buyers in the U.S. The CS stated that he was in contact with an organization in Las Vegas that was looking for large-scale suppliers of cocaine and heroin. The CS mentioned to Suarez that if he still had contacts with weapons

9

buyers, the CS had a cache of weapons available in Nicaragua. Suarez responded that he could find weapons buyers but to give him some time.

Later in September, 2004, the CS received a call from Suarez who stated that he had a large supply of cocaine in Panama ready to sell to the CS, and urged the CS to travel to Panama to meet with Suarez, Perez-Mazariegos, and "Hector" to close the deal. The CS stated that he personally was unable to travel to Panama at that time, but that he would send another representative of his organization to Panama to do the deal.

As a result of this conversation between Suarez and the CS, meetings were then set up from October 19-22, 2004 in Panama between Suarez ("alias" Armando), Perez-Mazariegos, and an undercover Panamanian law enforcement officer (UC) posing as a member of the CS' Las Vegas-based organization. Those meetings were coordinated by DEA Las Vegas and DEA Panama, as reflected in reports provided to defense counsel on October 30, 2007 and January 17, 2008. The discovery provided to defense counsel to date further traces the development of the conspiracy from that date forward. However, the events described above prior to October 2004 are critically relevant in showing logically how the charged conspiracy developed and to prove motive, opportunity, intent, plan, knowledge, identity and/or absence of mistake under Rule 404(b) of the Federal Rules of Evidence.

## 2.  Legal Analysis

**A. Evidence of the separate agreement, previous arrest, and attempt to launder money is intrinsic to the conspiracy and not subject to the strictures of Federal Rule of Evidence 404(b).**

Rule 404(b) only applies when the evidence is independent of a charged offense. *See* Fed. R. Evid. 404. Thus, Rule 404(b) does not apply to evidence of other crimes that is direct, or intrinsic, evidence of the charged offense. United States v. Allen, 960 F.2d 1055, 1058 (D.C.

10

Cir.), *cert. denied*, 506 U.S. 881 (1992); *see also* United States v. Green, 175 F.3d 822, 831 (10th Cir.), *cert. denied*, 120 S. Ct. 132 (1999).

When considering whether evidence of an uncharged offense is intrinsic, the D.C. Court of Appeals seeks to determine whether the uncharged offense "arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime at trial . . . ." United States v. Badru, 97 F.3d 1471, 1474 (D.C. Cir.), *cert. denied*, 520 U.S. 1213 (1997); *see also* United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996). Furthermore, the Tenth Circuit has established that "conduct during the life of the conspiracy that is evidence of the conspiracy is not Rule 404(b) evidence." United States v. Pace, 981 F.2d 1123, 1135 (10th Cir. 1992) (evidence of co-defendant's drug sale admissible against defendant because direct evidence of conspiracy).

The crime of conspiracy includes in its gambit of inextricably intertwined evidence all "[a]cts committed in furtherance of the charged conspiracy . . . ." United States v. Abrego, 141 F.3d 142, 175 (5th Cir.), *cert. denied*, 525 U.S. 878 (1998). Indeed, when proving a conspiracy "the government is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationships between the participants in the crime developed.'" United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir.) (quoting United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000)), *cert. denied*, 531 U.S. 972 (2000). In fact, "all the government need do is suggest a logical hypothesis of the relevance of the evidence for purposes other than to demonstrate [the defendant's] propensity to act in a particular manner." Abrego, 141 F.3d at 175 (quoting United States v. Krout, 66 F.3d 1420, 1431

11

(5th Cir. 1995)). Indeed, the evidence at issue will be presented "as direct evidence of the fact at issue, not as circumstantial evidence requiring an inference as to the character of the accused." Badru, 97 F.3d 1471, 1475 (D.C. Cir. 1996) (citing Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 450 (1978)).

Other circuits have expounded on the use of intrinsic evidence to prove the development of relationships within a conspiracy. In United States v. Rosa, the Second Circuit held that evidence explaining the roots of mutual trust between co-conspirators, even if such evidence includes prior bad acts, may be introduced as intrinsic evidence of the charged conspiracy. 11 F.3d 315, 334 (2d Cir. 1993), *cert. denied,* 511 U.S. 1042 (1994); *see also* United States v. Pipola, 83 F.3d 556, 566 (2d Cir.) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case"), *cert. denied*, 519 U.S. 869 (1996); United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004) ("In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators").

The evidence of an agreement for the CS to buy an additional 200 kilograms of cocaine on credit is inextricably intertwined with the charged conspiracy because it is part of the same transaction or series of transactions. First, both conversations about the additional 200 kilograms took place while the CS was conducting a transaction with Castro to purchase 700 kilograms for military grade weapons. In fact, the only reason to differentiate the two agreements is the method of payment (i.e. credit instead of weapons). Thus, it is not difficult, or unfair, to draw the inference that the purchase of cocaine, both the 700 kilograms and the 200 kilograms, was one transaction, or at the very least a series of transactions. Second, co-conspirators made the

relevant statements during the course, and in furtherance, of the conspiracy. The statements by Castro indicate that the defendants, and the CS to a degree, were trying to establish better rapport and cultivating trust in one another with the goal of conducting the conspiracy as smoothly as possible.

Suarez's attempt to hire the CS to launder money is also inextricably intertwined with the charged conspiracy. Suarez's statements about money laundering play a vital role in telling the story of the conspiracy, particularly the development of the relationship between Suarez and the CS. Given the nature of the conspiracy, mutual trust was a necessary commodity, and Suarez's statements indicate an effort to engage in further illegal activity with the CS further indicating a developing relationship of trust. Suarez's statements could also prove his attempt to get a fuller picture of the CS's background and their potential to work together. Each of these reasons indicates that Suarez's effort. Furthermore, Suarez's statements on money laundering are inextricably intertwined because it gives a fuller picture of the scope of the conspiracy. Money laundering is a necessary part of a narcotics trafficking conspiracy, and while it may not be the focus of an investigation, statements regarding payment, including the laundering of it are essential to give the full story of the conspiracy.

Finally, Gonzalez's previous arrest in Nicaragua is inextricably intertwined with, and in furtherance of, the charged conspiracy for many of the same reasons. Gonzalez was unfamiliar to the CS when they met in Nicaragua. This clearly played a role in Gonzalez's co-conspirator statement about his previous arrest in Nicaragua for smuggling cocaine. The statement tends to prove that Gonzalez knew that if he did not accompany the others to the weapons flash then it would raise a red flag in the mind of the CS. Thus, having a good reason, Gonzalez

13

communicated that with the CS in an effort to alleviate any doubts the CS might have had regarding Gonzalez's intent to follow through on the deal.

    **B. The statements concerning the separate agreement, attempt to launder money, and previous arrest are also admissible under the broad scope of 404(b).**

In addition to being admissible as direct evidence of the conspiracy, the statements are admissible under Federal Rule of Evidence 404(b). Rule 404(b) only prohibits "evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). The D.C. Circuit takes a broad view of this rule, and although Rule 404(b) appears to be a rule of restriction, the court has ruled that it is actually a rule of "inclusion rather than exclusion." United States v. Cassell, 292 F.3d 788, 792 (D.C. Cir. 2002); United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000); United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir.), *cert. denied*, 498 U.S. 825 (1990). Indeed, evidence of a defendant's prior bad act is admissible for purposes unrelated to the defendant's character or propensity to commit a crime, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b); *see also* Cassell, 292 F.3d at 792; Miller, 895 F.2d at 1436 ("[u]nder Rule 404(b), any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.")

In making a determination as to the type of criminal activity properly admitted under Rule 404(b) the D.C. Circuit has adopted a two-part test. United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994). First, the evidence must be probative of a material issue other than character. *See* Fed. R. Evid. 404(b). Second, the evidence must not be excluded under Rule 403. Clark, 24 F.3d at 264 (citing United States v. Washington, 969 F.2d 1073, 1080 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 922 (1993)). Trial courts have broad discretion when determining whether

evidence is admissible under Rule 404(b). *See* United States v. Watson, 894 F.2d 1345, 1349 (D.C. Cir. 1990). In fact, if the Court deems the evidence to be relevant, the Court should exclude the evidence only if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978). Thus, in close cases, the rule favors admitting evidence of prior bad acts. *See* United States v. Johnson, 802 F.2d 1459, 1463-64 (D.C. Cir. 1986). In fact, if there is a purpose other than character for which to introduce evidence of "other bad acts", then introduction of such evidence is not "unfair" even it may tend to paint the defendant as a criminal. United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982)

Evidence of the CS's prior relationship with Suarez in a narcotics and weapons trafficking organization are probative of motive, intent, plan, knowledge and absence of mistake under Rule 404(b) of the Federal Rules of Evidence. The Circuit Court of Appeals for the District of Columbia has reasoned that "the intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time prior thereto, particularly when the activity involves a continuous course of dealing." Id. (testimony about past drug deals by defendant that witness personally observed helped prove motive, intent, preparation, plan, knowledge, identity and absence of mistake); *see also* United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994) (evidence of a previous course of dealing with defendant involving the sale of cocaine helped prove intent to sell cocaine found in defendants' possession); United States v. Rogers, 918 F.2d 207, 210 (D.C. Cir. 1990) (questioning defendant about previous crack distribution allowed because such evidence indicated a familiarity with narcotics distribution and thus helped prove intent, knowledge and absence of mistake).

It is quite clear—as indicated by Suarez himself—that the charged conspiracy came about in large part because of Suarez's prior course of dealing with the CS. This prior relationship stemming from the Remon Way / Cruz-Garcia organization, and the resulting trust in the CS accorded by Suarez, elucidates how the charged conspiracy developed. Evidence of the relationship indicates Suarez's knowledge of narcotics trafficking, as well as Suarez's motive for initially contacting the CS about engaging in a narcotics conspiracy. The prior relationship also shows how Suarez's plan developed, including his utilization of the CS and his operation within Central America. Furthermore, this prior relationship indicates that Suarez did not make a mistake when he engaged in the charged narcotics trafficking conspiracy. Indeed, Suarez was experienced in narcotics trafficking and knew exactly what he was doing throughout the conspiracy. Finally, a key factor making the prior relationship highly probative is the extent to which it explains the CS's ability to identify Suarez's voice on audio recordings made early in the conspiracy. For all of these reasons, evidence of the prior course of dealings between Suarez and the CS are highly probative of motive, opportunity, intent, plan, knowledge, identity and/or absence of mistake, and such evidence should be introduced to give the court and the jury a complete picture of how the conspiracy began and developed.

Additionally, evidence of Suarez's prior relationship with the CS is not subject to exclusion under Rule 403 of the Federal Rules of Evidence. The only legitimate prejudice that may be engendered from introduction of this evidence is Suarez's propensity to traffic in drugs; however, objections based solely on the grounds that evidence tends to paint a defendant as a criminal are baseless. *See* Harrison, 679 F.2d at 948. Therefore, the potential prejudice of introducing the evidence comes nowhere close to substantially outweighing its probative value and it should be admitted at trial. *See* Day, 591 F.2d at 878.

The statements concerning the additional 200 kilograms of cocaine and Suarez's attempt to launder money are probative of motive, plan, and absence of mistake. Both statements show that it was the defendants' motive to engage in an on-going conspiracy to sell cocaine. The sale of cocaine to the CS on credit, as well as the attempt to get the CS to launder money, indicate that the defendants had a motive to continue their relationship with the CS. The defendants clearly saw their relationship with the CS, and thus the conspiracy, as a long-term undertaking that had the potential to expand. Thus, the two statements tend to indicate what the future plan of the conspiracy entailed.

The defendants' effort to engage in further illegal activity with the CS indicates an absence of mistake regarding the charged conspiracy. With a motive and a future plan established, the statements in question tend to prove that there was no mistake about the object of the conspiracy. These statements are also not excluded under Rule 403 because their probative value is clearly greater than any prejudice they may engender. *See* Fed. R. Evid. 403. Given the leeway the government has to use prior bad acts when proving a conspiracy, this is a pretty easy case to determine the statements are needed to tell the full story and any prejudice is simply incidental. *See* United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir.), *cert. denied,* 531 U.S. 972 (2000).

Finally, Gonzalez's statement about his prior arrest in Nicaragua for narcotics trafficking is extremely probative. Evidence of other acts of narcotics trafficking is particularly relevant and probative when used in a separate narcotics conspiracy charge to prove knowledge and intent. *See* United States v. Latney, 108 F.3d 1446 (D.C. Cir.) (evidence that defendant subsequently trafficked in drugs admissible under Rule 404(b), difference between subsequent and prior act of no consequence), *cert. denied*, 522 U.S. 946 (1997); Mathis, 216 F.3d at 26 (defendant's

17

participation in previous narcotics trafficking conspiracy admissible to prove intent). Gonzalez's statement that he had previously used Nicaragua as a country through which to facilitate drug transactions is particularly relevant and probative to the charge in this case. It tends to show that Gonzalez had the knowledge and intent necessary to engage in the conspiracy, as well as an absence of mistake. Additionally, given the latitude afforded the prosecution in conspiracy prosecutions, admission of Gonzalez's statement is appropriate to allow the prosecution to flesh out the story of the conspiracy, in particular to explain a potential source of confusion that could arise from Gonzalez not being present at the weapons flash. Again there is no concern for Rule 403 because any potential prejudice that introducing this statement may engender is far outweighed by the statement's probative value and is of minimal concern.

### C. Defendants own statements will prove their AUC connections.

CS testimony, as well as e-mails and telephone and body-wire recordings, as provided in discovery, will reveal defendant statements, adoptive admissions, and co-conspirator statements describing the defendants' connection to the AUC, particularly Suarez's role as a weapons and narcotics broker for the AUC, and Castro's role as a member of the AUC involved in weapons and narcotics trafficking logistics for the organization. To assist the jury in understanding this evidence, the government will present expert testimony about the AUC and its role in the international drug and weapons trade, as reflected in the government's Notice of Expert Testimony provided to defense counsel on June 23, 2008, and attached to this motion as Exhibit 1.

### 3. Conclusion

In conclusion, the Government intends to offer into evidence the three statements of the defendants: (1) Statement by Castro concerning the sale of an additional 200 kilograms of

cocaine; (2) Statement by Suarez concerning an attempted money laundering scheme; (3) Statement by Gonzalez concerning his previous arrest in Nicaragua for narcotics trafficking. This evidence is relevant and admissible as direct evidence of the drug conspiracy, and does not constitute "other crimes" evidence. Even so, the evidence is equally admissible under FRE 404(b).

The Government also intends to introduce evidence of Suarez's prior relationship with the CS through the Remon Way / Cruz Garcia drug and weapons trafficking organization. Evidence of this prior relationship is admissible under FRE 404(b) as probative of motive, opportunity, intent, plan, knowledge, identity and/or absence of mistake.

**WHEREFORE**, the Government submits that this evidence should be admitted at trial.

Respectfully Submitted,

_____
James A. Faulkner
Trial Attorney
Narcotics and Dangerous Drug Section
U.S. Department of Justice
1400 New York Ave., NW 8th Floor
Washington D.C. 20005
202-514-0917

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this pleading was delivered to all parties via ECF on this date, _____

_____
James A. Faulkner